Robert A. Simon
State Bar No. 18390000
Brandon Scot Pierce
State Bar No. 24002773
**WHITAKER CHALK SWINDLE
& SCHWARTZ, PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0543
Facsimile: (817) 878-0501
**Proposed attorneys for the Debtor,
EST Group, LLC**

IN THE UNITED STATES BANKRUTPCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE: § <br> § <br> **EST GROUP, LLC** § <br> § <br> **DEBTOR** § <br> § <br> § <br> § | CASE NO: 18-45031-mxm11 <br><br> **CHAPTER 11** <br><br> Hearing Date: Expedited <br> Hearing Time: Expedited |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL,
(II) PROVIDING ADEQUATE PROTECTION, AND
<u>(III) AND GRANTING RELATED RELIEF</u>**

TO THE HONORABLE MARK X. MULLIN,
UNITED STATES BANKRUPTCY JUDGE:

EST Group, LLC, a Texas limited liability company, debtor-in-possession, (the "Debtor"), files this Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Providing Adequate Protection, and (III) Granting Related Relief (the "Motion"). The Debtor seeks entry of an interim order substantially in the form attached hereto as Exhibit "A" (the "Interim Order") and a final order (the "Final Order") attached hereto as Exhibit "B" (collectively the "Cash Collateral Orders") pursuant to 11 U.S.C. §§ 105, 361, 363 and Federal Rule of Bankruptcy Procedure 4001, authorizing the Debtor to use cash collateral, providing adequate protection to secured creditors, JP Morgan Chase Bank ("Chase")

**DEBTOR'S EMERGENCY MOTION FOR INTERIM
AND FINAL AUTHORITY TO USE COLLATERAL - Page 1**
DMS 362981

and Dell Marketing, LLC ("Dell"), and granting related relief, including approval of interim and final Cash Collateral Budgets, with a monthly carve out for payment of the Debtor's professionals. In support, the Debtor respectfully states the following:

I.

**PRELIMINARY STATEMENT**

The Debtor is an IT services company, based in Arlington, Texas. It has two principal lines of business: (1) data storage hardware and services and (2) IT security services. On the data storage side, the Debtor is a re-seller of hardware and services, not a primary provider. Until recently, the Debtor's data storage business sold only Dell-based data storage products and services. The data storage business is capital intensive, because it requires the acquisition of expensive hardware from the primary provider. Beginning in February 2018, the Debtor began to diversify its offerings and sell non-Dell-based data storage products and services as well. The reasons for that change are detailed below. The Debtor's IT security service business serves its customers for an hourly fee and does not require the acquisition of expensive equipment. At its peak, the Debtor's revenues were approximately $31 million per year. Due to a sharp downturn in the Debtor's data storage business, revenues have declined to approximately $20 million, putting the Debtor in severe economic distress. The Debtor intends to downsize the data storage aspects of its business and diversify away from Dell. The Debtor has already reduced its staffing levels in accordance with the lower sales volume. Fortunately, the Debtor's IT services business is profitable and growing. The IT services business, along with a downsized data storage business should provide the Debtor with a platform for a successful reorganization.

The Debtor has two principal secured creditors, JP Morgan Chase Bank ("Chase"), which previously extended a line of credit to the Debtor, and Dell Marketing, LLC ("Dell"), which

acquired Castle Pines Capital, LLC's rights under a Credit Agreement, dated August 18, 2016.[1] On August 9, 2018, the Debtor entered into an installment payment with Chase (the "Chase Agreement"). On September 7, 2018, the Debtor and Dell signed an Amendment to Credit Agreement and Restructured Installment Payment Agreement, which is the current credit agreement with Dell (the "Dell Agreement"). Neither agreement involves the extension of new credit. Both the Chase Agreement and the Dell Agreement are simply work out agreements for the repayment of pre-existing debt. On the Petition Date, the Debtor was in compliance with both agreements. Both Chase and Dell are secured by blanket liens on all assets of the Debtor, with Chase in first position and Dell in the second position. Since the Chase liens and the Dell liens cover accounts receivable and proceeds, both creditors have an interest in "cash collateral," as that term is defined in 11 U.S.C. § 363(a).

<u>The Debtor intends to continue operating in Chapter 11, as a debtor in possession as it diversifies its data storage business away from Dell products, reduces its overhead, and continues to grow the IT security business.</u> The Debtor has an immediate need to use cash collateral to pay its employees, payroll taxes and benefits, employee expense reimbursements, software license renewals, and to pay vendors on contracts the Debtor is servicing for customers. The Debtor will suffer immediate and irreparable harm if not permitted to use cash collateral and pay those necessary expenses. Furthermore, the Debtor will need to use cash collateral on a final basis to fund its ongoing business operations, pay employees and employment taxes, buy inventory and supplies, and pay monthly debt service to Chase and Dell.

The Debtor has prepared a two (2) week interim budget (the "Interim Budget") to cover its operation for the first two weeks of January 2019, and a nine (9) month budget the ("Nine Month Budget") for ongoing, normal business operations through the projected Effective Date of

---

[1] Castle Pines Capital, LLC is a Wells Fargo affiliate. Wells Fargo and its affiliates are not creditors in this case.

**DEBTOR'S EMERGENCY MOTION FOR INTERIM
AND FINAL AUTHORITY TO USE COLLATERAL - Page 3**
DMS 362981

Plan of Reorganization in September 2019. A true and correct copy of the Debtor's 14-day Interim Budget is attached hereto, incorporated herein by this reference, and marked as Exhibit "C." A true and correct copy of the Debtor's Nine Month Budget is attached hereto, incorporated herein by this reference, and marked as Exhibit "D." The Debtor will provide adequate protection to Chase and Dell by: (1) living within its Interim Budget and its Nine Month Budget, including minor variances; (2) granting replacement liens on accounts receivable and proceeds; (3) maintaining its assets and operations; (4) growing the IT security business; (5) maintaining positive cash flow over the course of Budget; and (6) making monthly payments on the existing debt to Chase and Dell as set forth above in the summary and below in greater detail.

The Chase Agreement requires monthly payments of principal and interest in the amount of $20,364.66, with a balloon payment of approximately $300,000 on July 20, 2019. The Dell Agreement requires monthly payment of interest only, at the rate of 4.75%, in the amount of $9,751.00 from October 1, 2018 through June 1, 2019, and monthly payments of principal and interest in the amount of $77,352 beginning on July 1, 2019. The fair market value of the Debtor's assets is approximately $1.8 million, including cash, accounts receivable, furniture and office equipment, an amount less than the combined amount of the Debtor's obligations to Chase and to Dell. Chase, the first lien creditor is fully secured, but Dell is not. The Debtor intends to pay Chase $20,364.66 per month through plan confirmation in August or September 2019. The Debtor will treat the balance of Chase's claim through the Plan. The Debtor proposes to pay Dell $9,751.00 per month as adequate protection, with all payments applying to principal, as Dell's claim is under-secured and does not bear interest. The Debtor expects plan confirmation within nine (9) months. The Debtor anticipates full repayment to Chase through its plan. It is unlikely that Dell's claim will be paid in full, though a successful reorganization would provide

Dell with a far greater return than would a liquidation. Without cash collateral authority, liquidation would be inevitable.

## II.

## REQUESTED RELIEF

By this Motion, the Debtor seek entry of the Cash Collateral Orders (i) authorizing the Debtor to use cash collateral, (ii) providing adequate protection for the interests of Chase and Dell in cash collateral; and (iii) granting related relief, including (a) approval of the Debtor's Interim Budget and Nine Month Budget, (b) authorizing a $22,500 per month carve out from cash collateral for payment of the Debtor's professionals. The Debtor proposes to carve out each month $12,500 for bankruptcy counsel, $7,500 for the Debtor's financial advisor and virtual CFO (and his travel expenses), and $2,500 for the Debtor's accountant, Sutton Frost Cary.

## III.

## SUMMARY OF ADEQUATE PROTECTION

| Secured Creditor | Claim Amount | Collateral | Use of Cash Collateral | Adequate Protection | Authority |
|---|---|---|---|---|---|
| Chase | $393,696.32[2] | 1st lien on all assets | Maintenance of Debtor's assets and operations pursuant to the Budgets, pursuit of reorganization | Maintenance of operations and assets, granting of replacement liens, and monthly payments of principal and interest in the amount of $20,364.66 | 11 U.S.C § 361(1) and (2) and FRBP 4001(b)(1), 4001b(2), 4001(b)(3) |
| Dell | Approximately $2,500,000[3] | 2nd lien on all assets | Maintenance of Debtor's assets and operations pursuant | Maintenance of operations and assets, granting | 11 U.S.C § 361(1) and (2) and |

---

[2] Chase currently shows a balance of $410,749.76, but the Debtor has made a $20,364.66 payment to Chase that has not yet been credited. The Debtor believes that $393,696.32 to be the correct current balance.

[3] The exact figure is not known because the Debtor earns certain rebates from selling Dell products, which Dell sets off against the principal balance. Dell has not given the Debtor an update balance since September 2018.

DEBTOR'S EMERGENCY MOTION FOR INTERIM
AND FINAL AUTHORITY TO USE COLLATERAL - Page 5
DMS 362981

| | | | to the Budgets, pursuit of reorganization | of replacement liens, and monthly payments of $9,751 to be applied to principal | FRBP 4001(b)(1), 4001b(2), 4001(b)(3), 11 U.S.C. §506(b) |

Since the Debtor needs to expend cash daily to operate its business and would suffer immediate and irreparable harm if it had to wait fourteen (14) days for authority to do so, the Debtor seeks an emergency hearing and requests authority to spend the funds set forth in the Interim Budget. The Debtor also request a prompt final hearing for authority to use cash collateral pursuant to the Nine Month Budget.

## IV.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (M). Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## V.

## FACTUAL BACKGROUND

A. **Business History and Reasons for Chapter 11 Relief**

2. The Debtor filed its Chapter 11 petition on December 26, 2018 (the "Petition Date"). The Debtor maintains possession of its property and management of its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No creditors' committee has yet been formed.

3. The Debtor is located at 1907 Ascension Boulevard, Suite 100, Arlington, Texas 76006. The Debtor was founded in 2005. The Debtor has two primary lines of business: (1) IT security and (2) data storage. The Debtor's IT security business provides data security services

to a diverse array of clients for any hourly fee. That aspect of the Debtor's business in thriving. It generates approximately $400,000 to $500,000 in revenue per month, and sales are growing. The Debtor anticipates its greatest future growth in that business. That business does not require a large amount of capital.

4. The Debtor's data storage business is far larger in terms of gross revenue, but it has become unprofitable. Since 2008, the Debtor has served as a re-seller and servicer of Dell-based data storage products, hardware, software, and associated licenses and services. Dell has served the data storage market for many years, indirectly though re-sellers like the Debtor, and directly employing an in-house sales force. Dell's primary competitor in that market space was EMC. For approximately eight (8) years, the Debtor competed successfully with EMC in the data storage market space, primarily by re-selling Dell products and services. Dell supported those efforts and avoided direct competitor with the Debtor and similar marketing partners. The Debtor's customer base included large data storage users such as the BNSF Railroad, Sally Beauty Supply, Real Page, Service King, Torchmark, and the University of Texas System. In recognition of its long, successful and profitable relationship with Dell, in February 2016 the Debtor signed a two (2) year exclusive marketing agreement with Dell to sell only Dell data storage hardware and Dell-based data storage services. The Debtor did so to show loyalty to Dell, and the Debtor's in-house sale force outperformed other competitors in the local market.

5. Unfortunately, the marketplace has changed. In October 2016, Dell acquired EMC for $57 billion. In the process, Dell also acquired EMC's competing data storage products and EMC's large and aggressive in-house sale force. Overnight, the Debtor's largest and exclusive marketing partner became the Debtor's largest competitor with access to the Debtor's confidential client information, pricing, historical sales, and future opportunity information. This

marketplace shift put the Debtor in the difficult position of trying to compete directly with Dell as a re-seller of Dell hardware and Dell-based licenses and services. While Dell permits the Debtor to buy its products and re-sell them, the new business relationship put the Debtor at a significant competitive disadvantage, at least with respect to large customer accounts. As a result of Dell's inherent price advantage selling its own products and services directly, Dell's newly aggressive in-house sales force poached four (4) of the Debtor's largest accounts, including the BNSF Railroad (10% of annual revenues), Sally Beauty Supply, Real Page, and Service King. The loss of four (4) large accounts to Dell has cost the Debtor more than $10 million per year in annual revenues and put the Debtor in great financial distress. Dell continues to compete with the Debtor, using confidential information that it acquired from the Debtor at a time when such information was freely shared.

6.   The Debtor's cost structure was predicated on a growing $30 million per year business. The loss of the Debtor's four (4) largest customers to Dell made the Debtor's cost structure unsustainable and has forced retrenchment. In preparation of the Chapter 11 filing, the Debtor has downsized its workforce to reduce costs and eliminate employees who will no longer be needed to support the shrinking data storage business. To conserve cash, the Debtor did not replace a recently-resigned Vice-President who had earned $150,000 per year. The Debtor has reduced the annual salary of its CEO, Patricia "Patti" Spires from $270,000 to $150,000 and the salary of the Debtor's President, Tim Spires, from $190,000 to $150,000. The Debtor has surrendered possession of an office in Colorado Springs, Colorado, and will reject the lease immediately. The Debtor intends to downsize its office space in Arlington in February 2019 in accordance with its lower head count.

7. The Debtor has expertise in the use of Dell products. Many of the Debtor's Dell-based customers fall below the threshold that attracts attention from Dell's in-house sales force. The Debtor will continue to buy, install, and service Dell products for its customers, but at a smaller sales volume than the Debtor previously enjoyed. The Debtor has also begun selling products that compete with Dell/EMC, and is enjoying some success in the marketplace. The Debtor will work to develop and grow its non-Dell related business.

8. <u>The Debtor intends to use the Chapter 11 case to reduce its dependence on Dell, diversify its product line, expand its growing IT security business, restructure its financial affairs, and emerge from bankruptcy as a healthy competitor.</u> Due to the Debtor's past purchases of Dell products pursuant to a pre-petition credit agreement, Dell Marketing, L.P. is a large secured creditor, and the Debtor intends to treat its claims through a plan of reorganization.

B. **Secured Debt and Cash Collateral**

9. Until recently, the Debtor had a line of credit from Chase, which the Debtor used for regular operating expenses. Chase terminated the credit agreement and called the promissory note in response to an annual review of the Debtor's financial statements, which showed a substantial loss in 2017. At that time, the balance owed was approximately $735,000. The Debtor and Chase negotiated a work out and repayment plan, which is set forth in the Chase Agreement. A true and correct copy of the Chase Agreement is attached hereto, incorporated herein by this reference, and marked as Exhibit "E." The Chase Agreement sets forth a payment schedule of $20,364.66 per month beginning in August 2018 and continuing through June 2019. A balloon payment of approximately $300,000 will come due on July 20, 2018. The Debtor does not expect to have sufficient cash to on hand to make that balloon payment. However, the Debtor has made all required monthly payments thus far and currently owes Chase

approximately $393,696.32, once Chase credits the Debtor for the December 2018 payment.[4] The debt to Chase is secured by a first lien on all assets of the Debtor, including cash and accounts receivable. The Debtor believes that Chase is fully secured. The Debtor intends to pay Chase the monthly amount set forth in the Chase Agreement through plan confirmation and to pay the resulting balance through its plan.

10. The Dell debt arose from the purchase of data storage equipment for re-sale. Data storage products are expensive pieces of hardware. The Debtor historically financed the purchase of those products from Dell through Castle Pines Capital, LLC ("Castle Pines"), which is an affiliate of Wells Fargo Bank. Due to financial losses and a shortage of cash, the Debtor defaulted on the Castle Pines' credit agreement. Dell had guaranteed the credit agreement from Castle Pines and recently purchased it from Castle Pines, at Castle Pines' request. The Dell Agreement, referenced above, is an amendment to the original credit agreement with Castle Pines. The Dell Agreement (signed on September 7, 2018), fixed the amount of the Debtor's obligation at $2,600,248.51, after allowing for an offset of $326,056, in recognition of certain sales incentives, *i.e.* rebates earned by the Debtor but retained by Dell. A true and correct copy of the Dell Agreement is attached hereto, incorporated herein by this reference, and marked as Exhibit "F." For purpose of simplicity, the Debtor will refer to Dell (supplier of computer and data storage products) and all of its affiliated companies (including Dell Marketing, LLC) simply as "Dell." However, Dell Marketing, LLP is the actual counterparty to the Dell Agreement, and is the specific entity to which the Debtor owed $2,600,248.51 on September 7, 2018. Since that time, Dell has applied certain additional rebates earned by the Debtor to the principal amount of the indebtedness. The Debtor estimates that the rebates (and offset) total approximately

---

[4] Chase holds a personal guaranty from Tim Spires, the Debtor's President, Patricia Spires, the Debtor's CEO, and Kelly Foster.

**DEBTOR'S EMERGENCY MOTION FOR INTERIM
AND FINAL AUTHORITY TO USE COLLATERAL - Page 10**
DMS 362981

$200,000, though Dell has not provided any accounting since September 2018. Accordingly, the Debtor believes that the actual principal amount of the indebtedness is approximately $2,400,000.

11. Dell inherited Castle Pines' second lien security interest in all of the Debtor's assets. The Debtor's assets are worth approximately $1,800,000, and Chase has a first lien debt in the amount of $393,696.32. Consequently, Dell's claim is substantially under-secured. If the Debtor were liquidated and could not perform its ongoing contractual obligation, the liquidation valuation of the Debtor's assets would plummet. With the Debtor as a going concern, Dell's deficiency is approximately $1,000,000. If the Debtor were liquidated, the value of its accounts receivable would collapse. The Debtor estimates Dell's deficiency in a liquidation would be approximately $2,000,000. As a going concern, the Debtor can earn the money to repay Dell substantially more than Dell would receive in a liquidation.

C. **The Interim Budget**

12. The Debtor will need to expend approximately $350,000 in cash from January 1, 2019 through January 15, 2019, before a final hearing on authority to use cash collateral. The total expenses and an item by item break down are set forth in the Interim Budget attached hereto as Exhibit "C." In summary, the Debtor will need those funds to pay its employees and payroll taxes, pay certain vendors for on-going work on contracts, reimburse employee expenses, pay software license fees, engage its outside CFO and reimburse his travel expenses, and pay basic, essential marketing expenses. The Debtor will suffer immediate and irreparable harm if these expenses are not paid, as employees will leave, current contracts will fall into default, software licenses would expire, customers will be lost, and the value of receivables would melt.

D. <u>**Nine Month Budget**</u>

13. The Debtor reasonably anticipates that it will right-size expenses, diversify its smaller data storage business, grow its IT services business, and achieve confirmation of a plan of reorganization in the nine (9) month period following the Petition Date. During the time, the Debtor will need to use cash collateral to fund its operations and the reorganization. The Debtor has modeled its anticipated revenues and expenses during that time period. The financial model is set forth in the Nine Month Budget attached hereto as Exhibit "D." Though the Debtor's revenue will decline as it downsizes the data storage business, it will need less cash, due to reduced purchases of expensive hardware. The Budget assumes that the Debtor's revenues will bottom out during the winter of 2019 and begin to recover in the spring. As the Debtor's margins are far better in the IT security business, the Debtor expects to be profitability on an operating basis (excluding reorganization expenses) in January 2019 and to start accumulating cash in the spring. The Debtor anticipates that post-petition reorganization expenses for professionals (counsel, an accountant, and a financial advisor) will run approximately $22,500 per month, and will be funded in part by a $22,500 carve-out from cash collateral in the Nine Month Budget. The Nine Month Budget assumes reduced staffing level for several months, followed by a modest recovery in headcount as the IT services business continue to grow. The Debtor's principals have agreed to reduce their salaries by a combined $160,000 per year, until confirmation. The overall reductions in payroll expenses exceed $400,000. The closure of the Colorado office will save additional expenses. By late summer 2019, the Debtor should be ready to exit bankruptcy, continue the process of repaying Chase and Dell on their secured claims, and make a meaningful distribution to the unsecured creditors.

## VI.

## ADEQUATE PROTECTION

14. The Debtor proposes to provide adequate protection to Chase and to Dell in several ways. First, the Debtor will adhere to the Nine Month Budget, plus or minus a 10% variance per month. Second, the Debtor will maintain its assets and operations, thereby protecting and enhancing its ability to generate a future stream of income. Third, Chase is adequately protected by an equity cushion in its current assets, particularly the Debtor's accounts receivable. Dell is under-secured. However, the Debtor's accounts receivable are essential for its operations. The Debtor cannot reorganize without using the revenue that those accounts receivable will generate, provided that the Debtor continues to operate. The Debtor's continued operations will generate cash flow to fund a reorganization and pay claims. Fourth, pursuant to 11 U.S.C. § 552, on the Petition Date, the security interests of Dell and Chase would be cut off as to future accounts receivables. The Debtor proposes to grant Chase and Dell replacement liens on future revenues and accounts receivable from the Petition Date through plan confirmation. Fifth, the Debtor proposes to make monthly cash payments to Chase in the amount of $20,364.66 and to Dell in the amount of $9,751.00. The payment to Chase would be applied to principal and interest as set forth in the Chase Agreement. The payments to Dell would be applied to principal, as under-secured creditors are not entitled to interest on their claims. 11 U.S.C. § 506(b); *United Saving Association v. Timbers of Inwood Forest,* 484 U.S. 365, 367 (1988). The combination of those five measures will provide more than adequate protection for the interests of Chase and Dell in the Debtor's cash collateral. The Court should authorize interim use of cash collateral in accordance with the Interim Budget and final use in accordance with the Nine Month Budget.

## VII.

## AUTHORITY AND ARGUMENT

### A.  Use of the Cash Collateral Should Be Approved

13.  Section 363(c)(2) of the Bankruptcy Code governs the Court's approval of the use of cash collateral and provides that a debtor-in-possession may not use cash collateral without the consent of the secured party or approval by the Court. 11 U.S.C. §363(c)(2). By obtaining approval from the Court to use cash collateral, however, a debtor may continue to operate its business and maintain and enhance the value of its lenders' collateral. *See e.g., In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

14.  To the extent the Debtor's cash on hand represents "cash collateral," it is subject to the use restriction set forth in section 363(c)(2) of the Bankruptcy Code. The Debtor, therefore, seeks to use the cash collateral, consistent with the Interim Budget and Nine Month Budget Forecast, to operate its business. Specifically, the Debtor requires the cash collateral to meet payroll and benefit obligations to its employees, to pay vendors, to preserve and protect its assets, and to generally and otherwise pay obligations critical to continuing the operation of its business.

15.  Additionally, following the commencement of the case, the Debtor will need cash on hand to satisfy its contractual obligations. Failure to pay such obligations on a timely basis would require the Debtor to cease business operations, which would result in irreparable harm to the Debtor and eliminate any ability to reorganize effectively. The Debtor is mostly a provider of services. It owns no real estate and has few fixed assets. The Debtor's principal asset is its accounts receivable, whose value would collapse if the Debtor stops doing business. The real

value in the Debtor's business is its ability to generate future cash flow from providing data storage and IT services. Accordingly, the Debtor's going concern value is far greater than the liquidation value of its assets. If the Debtor is authorized to use cash collateral and continues operating as a going concern, the unsecured creditors, including Dell's under-secured claim, should receive a substantial distribution. In a liquidation, the unsecured creditors would receive nothing and Dell would suffer a much larger loss. Without immediate authorization from the Court to use cash collateral, the Debtor will be unable to operate its business and thereby preserve the value of its estate for the benefit of all creditors and parties-in-interest.

16. It is well established that a Bankruptcy Court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern.

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use cash collateral in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1019 (11th Cir. 1984); *see also In re Triplett*, 87 B.R. 25, 27 (Bankr. W.D. Tex. 1988) (Cash collateral may be used "for the general benefit of the estate and need not be devoted exclusively to the protection of the creditor or the collateral."). Accordingly, to avoid immediate and irreparable harm, the Debtor requires immediate use of cash collateral for the payment of necessary business expenses and to continue to operate its business during the period governed by the proposed Interim Order. Upon final hearing, after 14 days, the Court should approve the use of cash collateral on a final basis in accordance with the Nine Month Budget.

### B. The Interests of Chase and Dell Are Adequately Protected

17. The Debtor has performed its obligations under the Chase Agreement and the Dell Agreement. All required payments under those agreement have been made timely. However,

future payments will depend upon the Debtor's continued viability, which the use of cash collateral makes possible. The interests of Dell and Chase in cash collateral will be adequately protected by the Debtor's adherence to the Budgets, the new collateral and cash flow generated by continued operations, the granting of replacement liens, and continued monthly cash payments to Chase and Dell, as set forth in the Budgets. The alternative is a liquidation, which would demolish the value of the Debtor's accounts receivables, preclude any recovery to trade creditors, and vastly increase Dell's loss.

## VIII.

### REQUESTED RELIEF

WHEREFORE, the Debtor requests that the Court enter an Order in substantially the form of the Debtor's proposed Interim Cash Collateral Order approving interim use of cash collateral for 14 days in accordance with the Interim Budget and setting a prompt hearing on final approval of the use of cash collateral. After such final cash collateral hearing, the Debtor requests that the Court enter the proposed Final Cash Collateral and authorize the Debtor to use cash collateral on a final basis in accordance with the Nine Month Budget, including a carve out for professional fees and expenses, and authorize the Debtor to grant adequate protection to Chase and Dell as set forth herein to safeguard their respective interests in cash collateral. The Debtor requests such other and further relief as may be just and proper.

December 27, 2018.

Respectfully submitted,

**WHITAKER CHALK SWINDLE & SCHWARTZ, PLLC**

By: /s/ *Robert A. Simon*
    Robert A. Simon
    State Bar No. 18390000
    Brandon Scot Pierce
    State Bar No. 24002773
    301 Commerce Street, Suite 3500
    Fort Worth, Texas 76102
    Telephone: (817) 878-0543
    Facsimile: (817) 878-0501
    rsimon@whitakerchalk.com
    spierce@whitakerchalk.com
    **Proposed attorneys for the Debtor, EST Group, LLC**

## CERTIFICATE OF SERVICE

I hereby certify, on this 27th day of December, 2018, that I served a true and correct copy of the forgoing Emergency Motion for Interim and Final Authority to Use Cash Collateral on the creditors and parties in interest listed on the attached Service List by First Class United States Mail in a properly addressed envelope, postage prepaid.

    /s/ *Robert A. Simon*
    Robert A. Simon